IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Timothy W. Humphries, | : | |
| | : | Case No. 1:10-cv-749 |
| Plaintiff, | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting Motions for |
| David A. Chicarelli, *et al.*, | : | Summary Judgment |
| | : | |
| Defendants. | : | |

This matter is before the Court on (1) the Consolidated Motion for Summary Judgment of Defendants City of Carlisle, David Chicarelli, Dustin Moore, Sherry Callahan, Steven Badger, Jerry Ellender, and Ronald Hovell (Doc. 144) and (2) the Motion for Summary Judgment of Defendants Timothy Boggess, James Slyder, and Mark Brooks (Doc. 118).  Plaintiff Timothy W. Humphries, the former mayor of the City of Carlisle, Ohio, has alleged federal and state law claims against the City and current and former city officials and employees.  He asserts, generally, that Defendants conspired to damage his reputation and have him removed from office.  However, no material facts are in genuine dispute and Defendants are entitled to judgment as a matter of law pursuant to Rule 56 of the Federal Rules of Civil Procedure. Accordingly, the Court will **GRANT** the Motions for Summary Judgment.

I.      **BACKGROUND**

Except where specifically noted otherwise, the facts are derived from the Defendants' Statements of Proposed Undisputed Facts (Docs. 118-1, 144-1) and Humphries's Responses (Docs. 153-1, 154-1) thereto.

**A.     Parties**

Plaintiff Humphries held the elected position of the mayor of City of Carlisle for one four-year term from the beginning of 2008 through the end of 2011.  Humphries defeated the incumbent mayor, Defendant Jerry Ellender, in the 2007 election.  Humphries lost to Randy Winkler in the 2011 election.

Defendant City of Carlisle is a political subdivision of the State of Ohio, as defined in Chapter 2744 of the Ohio Revised Code.  The City has a governing Charter.

Defendant Ellender was the mayor of the City of Carlisle from January 1, 2004 through December 31, 2007.  Defendant Ronald Hovell was the acting city manager for the City in December 2007.  Hovell also acted as the IT manager and he held the position of finance director for the City.  He retired from the City in March 2008.  Defendant Sherry Callahan became the city manager in June 2008.  (Doc. 101-1, Callahan Aff. ¶ 1.)  Defendant David Chicarelli was a prosecutor and law director for the City at all times relevant hereto.  (Doc. 81, Chicarelli Dep. 7–8.)

Also at all times relevant hereto, Defendants Steven Badger, Mark Brooks, and Dustin Moore were police officers, Defendant James Slyder was a police lieutenant, and Defendant Timothy Boggess was the police chief for the City.  (Doc. 33, Am. Compl.; Docs. 34, 37, Answers.)

**B.     Allegations Concerning the Laptop Investigation**

The City of Carlisle provided Jerry Ellender with a city-owned laptop computer for his use while he was mayor.  He occasionally brought the laptop computer home.  Ellender did not believe that his use of the laptop was restricted.  He may have used the laptop at times for personal matters.  He also permitted his children to use the laptop occasionally.  At some point in

mid- to late-December 2007, Ellender surrendered possession of the laptop by leaving it in the mayor's office in the city building.

Ronald Hovell undertook a process to "clean" the laptop before it was assigned to Humphries, the incoming mayor.  Hovell had no formal IT training.  (Doc. 74, Hovell Dep. 23.) Hovell's intent was to (1) remove and store the files and records created and maintained by Ellender and (2) to preserve any public records on the computer.  Hovell testified that when he cleaned computers he would delete temporary files, the cache, the history files and other files that were not relevant.  He also ran a defragmenting and scan disk program.  He believed that the scan disk program would delete the internet history.  Hovell testified that he would not have expected to find "a thousand pages of Internet history dating from the opening of the computer up through January the 3rd of 2008 on the hard drive of the computer had he done a thorough job of cleaning it." (*Id.*, Hovell Dep. 50.)  Hovell returned the laptop to the mayor's office after he completed the cleaning process.

In early 2008, Humphries took possession of the laptop after he became mayor.  At least during the relevant time period, Humphries kept the computer in his office in the city building. His office door was usually locked.  (Doc. 58, Callahan Dep. 79.)  Humphries believed that the laptop was password protected, but he used the log-in name and password of the former mayor. (Doc. 97, Humphries Dep. 237, 243.)  He understood that the laptop was City property and was provided for his use while he was mayor, but he did not believe his use of it was restricted. (Doc. 98, Humphries Dep. 280–83.)  He acknowledged that the City could access the laptop to obtain public records stored on the laptop.  (Doc. 97, Humphries Dep. 236.)  On one occasion, another City employee used the laptop to make a presentation to City Council.  (*Id.*, Humphries Dep. 243.)  Finally, Humphries was aware that the City had an internet policy directed to

employees, but he did not consider himself an employee and did not ask whether the policy applied to him in his position as mayor.

In September 2009, Angie Cole, Humphries's cousin, took a "ride-along" in the patrol car of Officer Mark Brooks. Officer Brooks testified that Angie Cole told him during the ride-along that Humphries may have possessed child pornography on his computer. (Doc. 76, Brooks Dep. 54–55, 64–65.) During discovery in this case, she denied telling Officer Brooks that Humphries had child pornography on his computer. (Doc. 140, Cole Aff. ¶¶ 9–11; Doc. 68, Cole Dep. 47–48.) However, she admitted telling Officer Brooks that her brother, Casey Cole, told her that Humphries had "sick shit" on his computer. (Doc. 68, Cole Dep. 47–48.) Casey Cole testified that he had told Angie Cole that Humphries had "sick stuff" on his computer and that he "probably would have kids on there too." (Doc. 66, Casey Cole Dep. 52–53.) Casey Cole signed a written statement for Officer Brooks stating that he had seen pornographic images on Humphries's computer back in the years 2004–2005. (*Id.* Ex. NN.)

Officer Brooks reported the Angie Cole tip to Lieutenant James Slyder in either September or November 2009. Lt. Slyder informed Chief Boggess about Brooks's tip in November 2009. Lt. Slyder and Chief Boggess determined to begin an investigation by examining the laptop assigned to Humphries. They informed Sherry Callahan, the city manager, about the situation. Callahan confirmed that the laptop was owned by the City. Callahan accompanied the officers to the mayor's office, one of them unlocked the door, and the officers viewed the laptop located in the mayor's office. Lt. Slyder ran a program called PRE SEARCH on the laptop which searched for photographs on the hard drive. The program displayed images from the laptop long enough for Lt. Slyder and Chief Boggess to view the faces and bodies of the people in the images. Lt. Slyder and Chief Boggess believed the images showed males engaged

in sexual activity.  Lt. Slyder described the image of at least one male to be a "young male," but both officers testified that they could not estimate the age of the males.  (Doc. 70, Slyder Dep. 43; Doc. 72, Boggess Dep. 24.)  Lt. Slyder and Chief Boggess then contacted the Warren County, Ohio Sherriff's Department and Prosecutor's Office for assistance.

An assistant prosecutor for Warren County, Ohio drafted a search warrant based on information she received from Lt. Slyder and Chief Boggess.  A Warren County Court of Common Pleas judge authorized the search warrant on November 5, 2009.  The officers then seized the city-owned laptop from the mayor's office and a personal desktop computer from Humphries's home pursuant to the warrant.  Humphries gave his consent for the officers to seize his home computer pursuant to the search warrant.

The officers then contacted Officer Robert White, a police officer for the City of Lebanon, Ohio and a member of an FBI computer task force, for assistance in searching the computers.  Officer White found sexually explicit images on the computers, but he did not believe that any of the images qualified as child pornography.  However, he testified that he did not think that Lt. Slyder or Chief Boggess had been unreasonable for believing that the images might have involved minors.  (Doc. 114, White Dep. 51–52, 57.)  Officer White reviewed more than two hundred images that he found "closest to child pornography" with Lt. Slyder and Chief Boggess.  Officer White did not attempt to determine who had placed the images on the computer because no child pornography charges would be filed.  Humphries was not arrested nor charged with a crime as a result of this investigation.

Humphries alleged in the First Amended Complaint that the former mayor, Jerry Ellender, or his son used the City-owned laptop to access sexually-explicit materials on or about December 25, 2007 and December 26, 2007, when Ellender was still mayor.  (Doc. 33 at 383.)

Evidence found on the laptop by Plaintiff's purported expert, Jim Sauger, and reviewed by Officer White, suggests that the laptop remained in Ellender's possession and was accessed by members of his household through at least December 27, 2007.  (Doc. 114, White Dep. 109–12; Doc. 126, Sauger Dep. 43–53, 68–77; Doc. 147 Ex. JJJ.)  Ellender's son specifically denied during his deposition using the City-owned laptop to visit gay pornographic websites.  (Doc. 128 at 5042–43.)  Ellender testified that he had no knowledge of pornographic materials being viewed or stored on the laptop when it was in his possession.

**C.      Allegations Incidental to the Laptop Investigation**

On November 5, 2009, Officer Steven Badger was informed by another officer about the issuance of the search warrant.  Officer Badger was not on duty that day and did not participate in the laptop investigation.  Officer Badger's son had died several years earlier and his son's birthday had been on November 5.  Officer Badger called his mother on November 5 to discuss his deceased son.  He mentioned the issuance of the search warrant to his mother during their conversation.  The search warrant was a matter of public record on November 5, 2009, but Chief Boggess testified that he had ordered his officers not to discuss the laptop investigation outside of the department.  (Doc. 72, Boggess Dep. 54–55.)  On November 6, 2009, the Warren County judge who had authorized the search warrant placed the search warrant under seal.  Chief Boggess later disciplined Officer Badger for violating his "gag order."  (*Id.*)  Officer Badger accepted without objection the written reprimand and three-day suspension without pay.

At some point on or after November 6, 2009, Chief Boggess spoke to a newspaper reporter about the existence of the investigation and the warrant.  He did not disclose the subject of the investigation nor what was sought in the warrant.

David Chicarelli, the City's law director, was informed about the laptop investigation after the search warrant was issued.  Chief Boggess showed Chicarelli some of the images found on the laptop.  Chicarelli received a copy of the report prepared by Officer White from the FBI task force.  Chicarelli was requested by Callahan or a council member to give a report to City Council.  He prepared a written report which indicated that a search warrant had been issued and sexually explicit materials had been found on the laptop.  He did not state in the report that images of "male on male" pornography were found on the laptop.  Chicarelli's report was obtained by a journalist who mentioned it in an article in the *Middletown Journal*, but Chicarelli was not interviewed by the reporter.

**D.      Driving Incident Allegations**

On December 1, 2009 at approximately 12:30 a.m., Officer Dustin Moore, a rookie officer, was dispatched to the vicinity of State Route 123 in Carlisle, Ohio to respond to 911 telephone calls from the drivers of two vehicles.  The two drivers were Humphries and Tyler Anspach.  The men did not know each other prior to the driving incident.  Humphries had called 911 to report that another driver was following him too closely. Anspach had called to report that another driver was driving erratically and appeared to be drunk.  Humphries admitted that he increased and decreased his speed and changed lanes when he believed he was being followed. (Doc. 97, Humphries Dep. 178–79.)  Both Humphries and Anspach pulled over their vehicles when Officer Moore approached.

Humphries exited his vehicle with a souvenir baseball bat in his hands.  He approached Anspach's vehicle, which was between his vehicle and Officer Moore's vehicle.  He had been holding the bat in his hand when he drove in case he needed to defend himself from other driver. (*Id.*, Humphries Dep. 183.)  Officer Moore believed that Humphries was holding the bat with an

7

aggressive stance, but Humphries denied that he raised the bat above his waist or that he raised his voice. (Doc. 139, Moore Dep. 28; Doc. 97, Humphries Dep. 180.) Officer Moore understood that small bats could be hollowed out and contain a metal pipe in order to use the bat as a weapon. Officer Moore testified that Humphries gave him the bat when he asked for it, but Humphries testified that he surrendered the bat to Officer Moore voluntarily and without prompting. (Doc. 139, Moore Dep. 31–32; Doc. 97, Humphries Dep. 180–81.) Officer Moore did not observe any sign that Humphries was intoxicated. Officer Moore questioned both drivers, gave each a warning, and then permitted them to leave. Neither Humphries nor Anspach indicated that night that they wished to file charges against each other. Officer Moore did not report the incident to any one nor file an incident report at that time. (Doc. 139, Moore Dep. 38–39.)

Officer Moore mentioned Humphries's driving incident to Officer Brooks a few days later when they were exchanging stories. (*Id.*, Moore Dep. 40.) Chief Boggess later approached him. Chief Boggess told Officer Moore to write a report and handle the investigation as he would for any person. Officer Moore wrote an incident report after talking to Chief Boggess. He also spoke to Anspach again and asked him about being approached by Humphries with the bat. (*Id.*, Moore Dep. 58–59.) Officer Moore had Anspach complete a witness statement.

After Anspach completed the witness statement, Chief Boggess contacted the city attorney, David Chicarelli, about the incident. Chicarelli advised that he did not think that charges could be filed in the City of Carlisle's Mayor's Court and that Chief Boggess should take the matter to the City of Franklin's prosecutor. (Doc. 81, Chicarelli Dep. 199–200.) Franklin's prosecutor, Steve Runge, filed charges against Humphries from the December 1, 2009 driving incident for aggravated menacing, a first degree misdemeanor, and obstructing official business,

a fifth degree felony.  Citations were issued for the charges and Humphries accepted the citations

without being placed into custody.  Chicarelli had no further involvement in the driving incident

other than referring Chief Boggess to the Franklin prosecutor.  However, he did speak to

Humphries's attorney, Kevin Lennen, at one point and indicated to Lennen that he thought

Humphries should resign.

Officer Moore met with the prosecutor on at least one occasion about the charges.

However, he failed to show up at the preliminary court hearing because he did not properly

calendar the event.  The charges against Humphries, accordingly, were dismissed.  Officer

Moore was disciplined for failing to appear at the hearing.  The prosecutor decided not to re-file

the charges.

**E.    Procedural History and the February 3, 2012 Order**

Plaintiff Humphries initiated this lawsuit in state court on October 21, 2010 against

Defendants the City of Carlisle,  David Chicarelli, Sherry Callahan, Chief Timothy Boggess,

Lt. James Slyder, and Officers Dustin Moore, Mark Brooks, and Steven Badger.  (Doc. 1-1.)

Defendants removed the action to this Court on October 26, 2010.  With leave of the Court,

Humphries filed a First Amended Complaint (Doc. 33) on October 4, 2011, which added to the

suit Defendants Jerry Ellender, Blake Ellender, and Ronald Hovell.

On February 3, 2012, the Court issued an Order dismissing the claims against Blake

Ellender pursuant to a Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Doc. 47.)  In the

Order, the Court criticized Humphries for "substantive and organizational deficiencies" in the

First Amended Complaint, including the failure to specify the nature of each claim and against

which Defendant(s) the claims were pleaded.  (*Id.* at 476–77.)  Accordingly, the Court

specifically instructed the parties to specify in all subsequent briefs the following items for each

cause of action discussed:  (1) the nature of the claim; (2) whether the claim arises under state or federal law; (3) which Defendant or Defendants the claim is asserted against; and (4) the factual allegations which support or refute the claim.  (*Id.* at 485.)

Defendants filed the pending Motions for Summary Judgment on October 31, 2012 and December 3, 2012.  The parties were granted leave by the Court to exceed the standard page limitations because of the number of claims and Defendants in this action.  Briefing is complete and the Motions are ripe for adjudication.

## II.     STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The Court's task is not "to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine

issue for trial exists when there is sufficient "evidence on which the jury could reasonably find

for the plaintiff." *Id.* at 252. "The court need consider only the cited materials, but it may

consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.    ANALYSIS

Defendants in the Motions for Summary Judgment complied with the Court's February 3,

2012 Order. Defendants made a good faith attempt to discern every possible claim arguably

made against every possible Defendant in the First Amended Complaint. They set forth the

material, undisputed facts purportedly established by the record and articulated grounds for

granting summary judgment in their favor as to all claims.

Plaintiff Humphries did not comply with the February 3, 2012 Order in his summary

judgment briefing. He failed in his fifty-page Memoranda in Opposition to specify against

which Defendant each claim was asserted and he failed to identify the specific evidence

supporting each claim. He did not provide citations to the record to support most of his

assertions of fact. He failed altogether to address several of the claims which he had asserted

directly or indirectly in the First Amended Complaint.

District courts can "decline[] to consider the merits of [a] claim" which the plaintiff fails

to address in briefs opposing a summary judgment motion. *Hicks v. Concorde Career College*,

449 F. App'x 484, 487 (6th Cir. 2011). Moreover, courts can consider a claim abandoned when

a plaintiff offers only a perfunctory argument that it should withstand summary judgment. *Clark

v. City of Dublin, Ohio*, 178 F. App'x 522, 524–25 (6th Cir. 2006); *Campbell v. Nally*, No. 2:10-

cv-1129, 2012 WL 4513722, at *11–12 (S.D. Ohio Oct. 1, 2012). Finally, "courts need not

independently comb through the record and establish that it is bereft of a genuine issue of

material fact before granting summary judgment." *Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 734 (6th Cir. 2011). As the Sixth Circuit colorfully has recognized, "[c]ourts do not engage in a self-directed inquiry into the facts because district judges are not pigs, hunting for truffles.'" *LidoChem, Inc. v. Stoller Enters., Inc.*, No. 10–1686, 2012 WL 4009709, at *15 (6th Cir. Sept. 12, 2012) (internal quotation and citation omitted).

For these reasons, the Court assumes that Plaintiff Humphries did not intend to assert a particular claim against a particular Defendant or has abandoned such claim where he has failed to support the claim with evidence and legal argument. Specifically, the Court assumes that Plaintiff abandoned, among other claims, all claims against the City and all claims arising solely from the driving incident allegations. The Court addresses below those remaining claims which Plaintiff Humphries asserted in the First Amended Complaint and supported in the Memoranda in Opposition to the Motions for Summary Judgment.[1]

## A.  Violation of Fourth Amendment Pursuant to 42 U.S.C. § 1983

Humphries contends that summary judgment should be denied to Defendants on his claim against Chief Boggess, Lt. Slyder, and Officers Brooks, Badger, and Moore for violation of his Fourth Amendment rights arising from the laptop investigation. (Doc. 153 at 5372.) Specifically, he alleges that they violated his rights when Lt. Slyder and Chief Boggess ran the PRE SEARCH program on the City-owned laptop without a warrant. (Doc. 153 at 5365, 5372.)[2]

---

[1]  The Court will not address the merits of the fraud and aiding-and-abetting allegations which Plaintiff Humphries makes in the Memoranda in Opposition. (Doc. 153 at 5380–81.) Plaintiff Humphries did not assert those claims in the First Amended Complaint and nor has he established that those issues should be tried by the parties' express or implied consent pursuant to Rule 15(b)(2) of the Federal Rules of Civil Procedure. Rather, the Court previously stated in a footnote in the February 3, 2012 Order that "[t]he Court does not read the First Amended Complaint to assert a claim for either fraud or aiding and abetting." (Doc. 47 at 482 n.2.) Humphries did not move for reconsideration of that Order or otherwise challenge the Court's finding as to the fraud and aiding-and-abetting claims.

[2]  Plaintiff Humphries also suggests in the "statement of facts" in the Memoranda in Opposition that the search warrant by which Humphries's City-owned laptop and personal computer were seized was improperly obtained. (Doc. 153 at 5366–71.) However, he does not analyze or explain how the facts alleged establish a Fourth Amendment violation in the "argument of law" section or against which Defendants such a claim could be proven.

Section 1983 creates a cause of action to remedy constitutional violations as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.  The Fourth Amendment creates a right to be free from "unreasonable searches and seizures" and states that warrants shall only be issued "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend 4.  Defendants move for summary judgment on the grounds that the claim fails on the merits or that the individual Defendants are entitled to qualified immunity.

The doctrine of qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity provides immunity from suit, not simply a defense to liability.  *Pearson v. Callahan*, 1555 U.S. 223, 231 (2009).  Courts apply a two-part test to determine if qualified immunity applies: (1) determine whether the facts alleged would establish that the government official's conduct violated a constitutional right and (2) determine whether the specific right violated was clearly established.  *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001).  A defendant is entitled to qualified immunity if his conduct violated a constitutional right, but that right was not clearly established at the time of the violation.  *Id.*  The inquiry into whether the constitutional right was clearly violated "must be undertaken in light of the specific context of the case, not as a

---

It is significant, of course, that the search warrant was obtained by an assistant Warren County prosecutor, not by the Defendants.

broad general proposition." *Id.* at 201.  Courts can examine either issue first.  *Pearson*, 555 U.S. at 236.  The plaintiff bears the ultimate burden of proof to establish that a defendant is not entitled to qualified immunity.  *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992).

The Court begins by recognizing that there is no evidence that Officer Brooks, Officer Badger, or Officer Moore participated in the search and seizure of the laptop computer.  Only Lt. Slyder and Chief Boggess entered the mayor's office in the City-owned building and ran the PRE SEARCH program on the laptop.  Officer Brooks initiated the investigation when he reported the tip he received that Humphries had child pornography or other sexually-explicit material on his laptop.  Humphries does not point to evidence indicating that Officer Brooks was present for or participated in the search of the laptop.

Likewise, it is undisputed that Officer Badger played no role in the search or seizure of the laptop.  (Doc. 154-1 at 5527.)  Officer Badger merely disclosed the existence of the search warrant to his mother in violation of Chief Boggess's gag order.  The warrant had not been sealed by the state court judge at the time Officer Badger made the disclosure.  Humphries cannot establish a claim for violation of his federal rights against Officer Badger on these facts as a matter of law.  Finally, the factual allegations against Officer Moore all relate to the driving incident and not to the laptop investigation.  As such, the Fourth Amendment claim fails as a matter of law as to Officer Brooks, Officer Badger, and Officer Moore.

Humphries contends that the warrantless search of the City-owned laptop was an unreasonable search and seizure by Lt. Slyder and Chief Boggess.  Humphries's contention presupposes that he had a legitimate expectation of privacy as to the laptop.  He points out that the tipster, Angie Cole, stated at most that he had sexually-explicit material on his computer, not

necessarily on the City-owned laptop.  "A defendant must satisfy a two-pronged test to show a legitimate expectation of privacy: 1) he must manifest an actual, subjective expectation of privacy; and 2) that expectation is one that society is prepared to recognize as legitimate."  *U.S. v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000).  Humphries contends that he had a legitimate expectation of privacy in the laptop.  Humphries focuses on the fact that the City did not restrict his use of the laptop and that the laptop was located in his locked office.

On the other hand, Humphries worked in his office, which was located in the a City-owned building, only three days per week.  (Doc. 98, Humphries Dep. 284.)  At least five people other than Humphries had keys to the mayor's office, including the city manager, the police chief, and the city finance director.  (Doc. 97, Humphries Dep. 240.)  As to the laptop, Humphries admitted that the laptop had been used by another person to make a presentation to City Council.  (*Id.*, Humphries Dep. 243.)  He had not updated the log-in and password on laptop from those used by the former mayor.  He understood that communications he made using the computer regarding City of Carlisle business were public records and subject to public records searches.  (*Id.*, Humphries Dep. 235–36; Doc. 98, Humphries Dep. 282.)  These facts present a close question as to whether Humphries had a legitimate expectation of privacy in the laptop.

Nonetheless, Defendants contend that their search was reasonable as a matter of law because Callahan, the city manager, consented to the search of the City-owned laptop.  The Supreme Court has recognized that in some circumstances "permission to search [can be] obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."  *U.S. v. Matlock*, 415 U.S. 164, 172 (1974); *see also U.S. v. Hart*, No. 08-109-C, 2009 WL 2552347, at *16 n.83 (W.D. Ky. Aug. 17, 2009) (applying *Matlock* to find that company owner could give consent to search workplace computer

despite the objection of the employee to whom the computer was assigned).  Humphries challenges Callahan's authority to consent to a search of the laptop computer.  He argues that the city manager was not "a supervisor or co-worker" of the mayor.  (Doc. 153 at 5373–74.)  However, the issue is not whether Callahan was Humphries's supervisor or co-worker given his status as an elected official.  The issue is whether she had common authority over the City-owned laptop.

The Charter of the Municipality of Carlisle provided that the city manager is the "chief executive and administrative officer" of the City of Carlisle.  (Doc. 58 at 748, Callahan Dep. Ex. 2.)  Humphries conceded that "the City" had at least some authority over the laptop to the extent that "the City" could access the laptop to respond to a public records request.  (Doc. 153-1 at 5403.)  It follows that Callahan, as the City's administrative officer, would have authority on behalf of the City to access the laptop for that purpose.  Additionally, Callahan was one of several city officials with keys to the mayor's office where the laptop was kept, an office in which Humphries worked only three days per week.  Again, these facts present at least a close question of whether City Manager Callahan had common authority over the laptop to permit Lt. Slyder and Chief Boggess to search the City-owned laptop without violating Humphries's Fourth Amendment rights.

However, even if a reasonable jury could conclude that Humphries's Fourth Amendment rights were violated, Humphries still must establish that the rights violated were clearly established.  The inquiry into whether constitutional rights were clearly established for purposes of qualified immunity "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Saucier*, 533 U.S. at 201.  The relevant specific facts in this case include that the laptop was City-owned, that it was located in an office in a City-owned building

in which Humphries worked in only part-time and for which multiple city officials had key access, that it contained public records which Humphries understood the City had a right to obtain, and that consent for the search was given by the City's top administrative officer.

For the reasons explained above, whether Humphries's Fourth Amendment rights were violated is not "sufficiently obvious." *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005) (internal citation and quotation omitted). Accordingly, Humphries has the burden to identify a body of "materially similar" case law to prove that the Fourth Amendment rights at issue were clearly established. *See id.* He does not meet that burden. Plaintiff Humphries cites to no caselaw supporting a finding that the search of a City-owned laptop done with the city manager's consent violated clearly established rights. In fact, in the Memoranda in Opposition, Humphries provides only a bare-bones overview of the parameters of qualified immunity generally. (Doc. 153 at 5374.) He makes no attempt to meet his evidentiary burden and explain why Lt. Slyder and Chief Boggess would not be entitled to qualified immunity under the specific facts of this case. *See Rich*, 955 F.2d at 1095 (burden on the plaintiff). Accordingly, the Court finds that Lt. Slyder and Chief Boggess are entitled to summary judgment on the grounds of qualified immunity as to the Fourth Amendment claim. *See Reardon v. Midland Community Schs.*, 814 F. Supp. 2d 754, 774 (E.D. Mich. 2011) (granting summary judgment when the plaintiffs failed to identify particularized case law establishing the right).

For these reasons, the Court will grant summary judgment to Defendants as to the Fourth Amendment claims.

## B.    Civil Conspiracy

Humphries contends that summary judgment should not be granted as to his claim for federal civil conspiracy against Officer Brooks, Chief Boggess, Lt. Slyder, David Chicarelli, and

Jerry Ellender.  (Doc. 153 at 5375–81, 5395–97.)  He does not specifically identify any other named defendants as participating in the conspiracy, but he asserts that Jerry Ellender's son and Tyler Anspach, the driver of the other vehicle during the December 1, 2009 driving incident, were participants in the conspiracy.  (*Id.* at 5380, 5397.)  Humphries includes both the laptop computer investigation and the driving incident charges as being part of one conspiracy to defame him, violate his rights, and remove him from office.

> The Sixth Circuit has set forth the parameters of a claim for federal civil conspiracy:
>
> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action.  Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy.  Each conspirator need not have known all of the details of the illegal plan or all of the participants involved.  All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Hooks v. Hooks,* 771 F.2d 935, 943–44 (6th Cir. 1985).  A conspiracy can be proven with circumstantial evidence.  *Nelms v. Wellington Way Apts., LLC*, No. 11-3404, 2013 WL 408034, at *7 (6th Cir. Feb. 4, 2013).

Defendants move for summary judgment on the grounds that Plaintiff Humphries cannot establish the merits of a conspiracy claim and on the basis of the intracorporate conspiracy doctrine.  The Court agrees that summary judgment is appropriate on both bases.  To begin, Humphries does not clearly articulate, much less establish with evidence, the existence of a single plan.  Humphries asserts that he *alleged in the First Amended Complaint* that the conspirators sought to "deprive the Plaintiff of his rights, privileges, and immunities."  (Doc. 153 at 5379, 5396–97.)  These Defendants did not move to dismiss this claim pursuant to Rule 12(b)(6) so the Court has not passed upon the issue of whether Humphries adequately *pleaded* a

conspiracy claim.  Regardless, vague and conclusory allegations are not sufficient to withstand a motion for summary judgment.

Moreover, there is no evidentiary basis to connect the laptop investigation and the driving incident.  The driving incident was instigated when Humphries and Tyler Anspach separately called 911 to report each other for erratic driving.  Officer Moore responded to the incident only a result of their telephone calls.  There is no evidence that Anspach knew about or sought to further a conspiratorial objective when he made the 911 telephone call or provided witness statements to Officer Moore.

Additionally, Humphries has not established a genuine issue that an overt act was committed in furtherance of the alleged conspiracy.  The alleged overt act identified by Humphries in the Memoranda in Opposition is the "downloading and imprinting [of] a 'Trojan Horse'" consisting of the sexually-explicit images into the City-owned laptop assigned to Humphries for his use as mayor.  (Doc. 153 at 5379, 5396.)[3]  Humphries's accusation that Jerry Ellender, the former mayor, or his son nefariously accessed sexually-explicit images with the City-owned laptop in 2007 as a "Trojan Horse" scheme to injure Humphries in 2009 utterly lacks evidentiary support.  There is no evidence that Jerry Ellender knew that pornographic images were accessed or downloaded onto the City-owned laptop in 2007 prior to the time the laptop was turned over to Humphries, much less that he shared in an alleged conspiratorial objective. There may be a question of fact based on the evidentiary record whether Ellender's son accessed the sexually-explicit images, but there is no evidence indicating that he did so to further the alleged conspiratorial designs of the named Defendants.

---

[3]  Humphries also cites from the deposition of Kevin Lennen, his attorney at that period, speculating that there may have been a conspiracy against his client.  A non-movant must offer more than non-specific speculation, however, to defeat a motion for summary judgment.

Finally, Defendants are entitled to summary judgment on the basis of the intracorporate conspiracy doctrine. That doctrine recognizes that it takes two or more persons to have a conspiracy and that a corporation, acting through one or more agents, cannot conspire with itself. *Estate of Smithers ex rel. Norris v. City of Flint*, 602 F.3d 758, 765 n.4 (6th Cir. 2010). The Sixth Circuit specifically declined in the *Estate of Smithers* case to determine if the intracorporate conspiracy doctrine applied to protect police officers and police departments. *Id.* at 765 n.6. However, District Courts within this Circuit have applied the doctrine to police officers and city officials. *See Moes v. Woodward*, Nos. 1:11-cv-912, 1:12-cv-1092, 2012 WL 5830596, at *6 (W.D. Mich. Nov. 16, 2012) (stating that a City and its employees do not qualify as "two or more persons"); *Irons v. City of Bolivar*, --- F. Supp. 2d ---, 2012 WL 4829185, at *2 (W.D. Tenn. Sept. 28, 2012) (stating that alleged conspiracy between agents of a city constituted a single act of the city); *Bradley v. City of Cleveland*, No. 1:11cv781, 2012 WL 775106, at *4–5 (N.D. Ohio Mar. 7, 2012) (applying doctrine to police officers). This Court likewise finds that the City officials and employees constitute one entity for the purposes of civil conspiracy.

Plaintiff Humphries asserts that the inclusion of Jerry Ellender, his son, and Tyler Aspach, who are not employees of the City of Carlisle, defeats application of this doctrine. However, the Court explained above that there is no evidence upon which a reasonable jury could conclude that Ellender, his son, or Aspach, shared in any conspiratorial objective. The other named Defendants are agents of the City of Carlisle and do not qualify as co-conspirators.

The Court will grant summary judgment to Defendants for all of these reasons.

## C.    False Light and Defamation

Turning to the state law claims, Humphries asserts that summary judgment should be denied as to his false light and defamation claims. Humphries fails to clearly set forth against

which Defendants these claims are asserted in disregard of the Court's February 3, 2012 Order.

He also fails to explain which specific facts in evidence support the claims.  Instead, he merely

sets forth the elements of, and discusses the differences between, the torts of false light and

defamation.  (Doc. 153 at 5381–83).  The argument, at best, is perfunctory.  The Court will not

try to independently comb the record to determine whether there are material facts in dispute

sufficient to establish claims of false light or defamation.  Accordingly, the Court will grant

summary judgment to all Defendants on the claims of false light and defamation.

**D.       Wrongful Interference with Employment**

Humphries also asserts that summary judgment should be denied to Defendants on his

claim for wrongful interference with employment.  Plaintiff Humphries does not explicitly state

against whom this claim is asserted, but he identifies only David Chicarelli when discussing this

purported claim in the Memoranda in Oppostion.  (Doc. 153 at 5384.)  The Ohio Supreme Court

has recognized a claim for wrongful interference with a business relationship "when a person,

without a privilege to do so, induces or otherwise purposely causes a third person not to enter

into or continue a business relation with another."  *A & B-Abell Elevator Co., Inc. v.*

*Columbus/Central Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 15, 651 N.E.2d 1283

(1995).

Humphries limits his argument supporting this claim to an excerpt from the deposition of

Kevin Lennen.  Lennen was an attorney who represented Humphries at the time the laptop

allegations and the driving incident were being investigated.  (Doc. 151, Lennen Dep. 4.)

Lennen testified in this excerpt that Chicarelli told him that Humphries should "consider

resigning" because "they got all this child pornography."  (Doc. 153 at 5384.)  This deposition

testimony alone is not sufficient to support a claim for wrongful interference with employment.

Humphries did not have a traditional employment relationship with the City of Carlisle. He was an elected official, not a contractual or at-will employee of the City of Carlisle.  To the extent he could be considered an employee of the City of Carlisle, the tort of wrongful interference with employment requires interference by someone outside the employment relationship, not by another employee.  *Ohio Ass'n of Pub. Sch. Emp. v. Madison Loc. Sch. Dist. Bd. of Educ.*, 190 Ohio App. 3d 254, 267, 941 N.E.2d 834 (2010).  Chicarelli, as an employee of the City of Carlisle, cannot be liable under this standard for interfering with Humphries's purported employment relationship with the City.  *Id.*  Also, Humphries cannot establish any injury.  *See Lennon v. Cuyahoga Cty. Juvenile Ct.*, No. 86651, 2006 WL 1428920, at *5 (Ohio App. May 25, 2006) (listing injury as an element of the cause of action).  Humphries remained in office as mayor until he lost his bid for re-election in 2011.  He was not removed from office by Chicarelli, the City of Carlisle, or any Defendant prior to that election.  The Court will grant summary judgment to all Defendants on the wrongful interference with employment claim.

**E.    Breach of Contract**

The breach of contract claim also appears to be asserted against Chicarelli.  (Doc. 153 at 5384–85.)  Humphries asserts that Chicarelli violated his own employment contract with the City of Carlisle to represent Humphries.  (*Id.*)  Chicarelli's employment contract stated that he "contracted to be the legal advisor, attorney and counsel for the City, and for all officers, departments, divisions, bureaus, boards, commissions and bodies of the City In [sic] connection with municipal affairs."  (Doc. 81, Chicarelli Dep. Ex. 1.)  Humphries's theory presupposes that Chicarelli owed a duty to him personally under this employment contract.  Even assuming this theory to be correct, he does not provide facts sufficient to prove a breach of contract.

22

Humphries argues as follows: "David Chicarelli, while under contract to represent Council members and officers such as the Mayor, worked to publicize falsely that the Plaintiff had viewed child pornography or homosexual pornography on the laptop computer."  (Doc. 153 at 5384–85.)  Humphries, however, does not set forth facts to support the allegation that Chicarelli "worked to publicize falsely" information about Humphries.  Rather, the evidence that Chicarelli discussed the matter with anyone is limited.  Chicarelli provided a report to City Council upon request in which he which indicated that a search warrant had been issued and sexually explicit materials had been found on the laptop.  The report was leaked to a journalist, but there is no evidence that Chicarelli leaked the report.  There is also no evidence that the report was untruthful.

Kevin Lennen, Humphries's attorney, testified that Chicarelli discussed the allegations against Humphries with him.  However, Humphries does not explain how Chicarelli's communication with the mayor's personal attorney would support a claim for breach of contract for publicizing false allegations.  Finally, Humphries does not set forth facts providing damage or injury from the alleged breach.  The Court will grant summary judgment to Chicarelli on the breach of contract claims.

**F.      Substantive Due Process and Procedural Due Process**

Humphries sets forth elements of claims for violations of substantive and procedural due process in his Memoranda in Opposition.  (Doc. 153 at 5385–86.)  Humphries did not clearly state claims for violation of due process in the First Amended Complaint.  Rather, he alleges in one paragraph only that he had rights under the Due Process Clause of the Fifth and Fourteenth Amendments.  (Doc. 33 at 377.)  In the Memoranda in Opposition, he categorizes the due process claims as state law claims, but he cites only federal caselaw in explaining the nature of

23

the due process claims. Moreover, in violation of the February 3, 2012 Order, Humphries did not identify against whom the claims are asserted or the facts which would support or refute the claims. The Court will not undertake to articulate claims for violations of due process for Humphries nor will the Court parse through the record searching for facts to support the claims. *See LidoChem*, 2012 WL 4009709, at *15 (stating that courts need not engage in a self-directed inquiry of facts); *Emerson*, 446 F. App'x at 734 (stating that courts need not independently comb through the record). The Court will grant summary judgment to Defendants on the purported claims for violations of due process.

## G.    Negligence

Humphries asserts a claim for negligence against Hovell, the IT manager, for failing to properly "clean" the City-owned laptop before it was transferred from the possession of Ellender, the former mayor, to Humphries for his use as mayor. (Doc. 153 at 5397–98.) Humphries also makes vague allegations of negligent hiring or supervision against Callahan, the city manager, and Chief Boggess. (Doc. 153 at 5390–91, 5393.) The elements of a negligence claim are duty, breach of duty, and causation of an injury. *Menifee v. Ohio Welding Prods.*, 15 Ohio St. 3d 75, 77, 42 N.E.2d 707 (1984); *see also Brittingham v. General Motors Corp.*, 526 F.3d 272, 278–79 (6th Cir. 2008) (citing *Menifee*).

Defendants move for summary judgment on multiple grounds, including that they were entitled to immunity pursuant to Ohio Revised Code Chapter 2744. Ohio Revised Code § 2744.03(A)(6) provides "immunity to employees of political subdivisions of Ohio except where (a) the employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) the employee's acts or omission were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (c) civil liability is expressly imposed

24

upon the employee by a section of the Revised Code." *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 791 (6th Cir. 2012).  The only provision relevant here is whether the Defendants are excluded from Chapter 2744 immunity by virtue of the fact that they acted with malicious puporse, in bad faith, or in a wanton and reckless manner.

Regarding the claim against Hovell, Humphries offers facts which support, at most, a finding that Hovell failed to exercise due care in cleaning the laptop computer.  Humphries does not point to facts sufficient for a reasonable jury to find that Hovell acted with malice or in bad faith.  Humphries does not dispute Hovell's testimony that Hovell did not see pornographic images on the laptop at the time he cleaned it.  (Doc. 154-1 at 5524; Doc. 144-2, Hovell Aff. ¶ 5.)  He also does not dispute Hovell's testimony that he did not view the internet history files when he cleaned the laptop, but that he thought that the internet history would be deleted when he ran a "scan disk" program.  (Doc. 154-1 at 5523–24.)  At most, Humphries challenges whether Hovell was reasonable in his belief because he had not received any formal training on how to clean a computer.  (*Id.*)  No reasonable jury could find that Hovell acted maliciously, wantonly, or in bad faith based on these facts.  Accordingly, Hovell is immune from the negligence claim pursuant to Ohio Revised Code § 2744.03(A)(6).

The negligent failure to train or supervise claims against City Manager Callahan and Chief Boggess, to the extent that they arise under Ohio law, also fail as a matter of law. Humphries alleges that Callahan and Chief Boggess had the duty to hire, fire, train, and supervise employees in the City of Carlisle police department.  (Doc. 153 at 5390–91, 5393.) Humphries points out that Chief Boggess testified that he was not qualified to conduct a child pornography investigation.  (Doc. 72, Boggess Dep. 72.)  In fact, Boggess testified that if child pornography had been found on Humphries's City-owned laptop or computer, he would have

turned the investigation over to the county sheriff's office.  (Doc. 72, Boggess Dep. 70.)  This statement suggests an intention to avoid negligent police work.  Humphries provides no other relevant purported facts, supported by citation to the record, regarding the negligent training and supervision claim.  Certainly, Humphries has not offered sufficient facts for a reasonable jury to find that Callahan or Chief Boggess acted with malice or in bad faith.  The Court finds that Callahan and Chief Boggess are entitled to summary judgment on the merits of the negligence claim or on the basis of qualified immunity pursuant to Ohio Revised Code § 2744.03(A)(6).

## IV.    CONCLUSION

For the foregoing reasons, the Motions for Summary Judgment (Docs. 118, 144) are hereby **GRANTED** as to all claims and as to all Defendants.

IT IS SO ORDERED.


S/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court